## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Data Intensity LLC**

              v.                                    Case No. 21-cv-781-PB
                                                    Opinion No. 2024 DNH 022
**Nathan Spero, et al.**

## MEMORANDUM AND ORDER

Two brothers, Josh and Nate Spero, were working for Data Intensity,
LLC when they formed Freedom Tech, LLC as a competing business. In this
action, Data Intensity alleges that the Speros breached the terms of their
employment contracts and their fiduciary duties to Data Intensity by
improperly retaining the company's confidential information, soliciting
company clients, and competing against the company.

The Speros have moved for summary judgment on Data Intensity's
contract claims because they contend that the non-solicitation and non-
compete clauses in their employment agreements are unreasonable and
therefore unenforceable restraints on competition. Data Intensity has
responded with a cross motion for partial summary judgment seeking
judgment as to liability only on its breach of contract claims against both

defendants and its breach of fiduciary duty claim against Josh.[1] Because I conclude that the employment agreements are enforceable and the undisputed evidence demonstrates that Data Intensity is entitled to judgment on the claims at issue, I deny the Speros' motion for summary judgment and grant Data Intensity's cross motion.

## I.   <u>BACKGROUND</u>

### A.   **Data Intensity's Business Operations**

Data Intensity is a global corporation that offers a suite of IT services to businesses that utilize Oracle products. Doc. 39-1 at 3. Data Intensity provides three "core offerings" to its customers: managed services, professional services, and resale. Id. at 11-12. Through its managed services offering, Data Intensity hosts and operates its customer's IT infrastructure on an ongoing basis. Doc. 39-4 at 5. Professional services are project-based services through which Data Intensity optimizes or upgrades a defined aspect of a customer's IT environment. Id. Resale involves selling Oracle licenses to customers for use in their business operations. Id.

Oracle users periodically must purchase new or additional licenses to remain in compliance with Oracle's rigorous licensing requirements. Doc. 48-2 at 2. To purchase an Oracle license, customers typically work with a Value-

---

[1]      Because they share a last name, I refer to Josh and Nate Spero by their first names throughout the order.

Added Reseller (VAR), that essentially serves as a broker to facilitate the purchase. Id. VARs must be an "Oracle approved reseller" to engage in resale generally and must attain specific certifications in order to resell certain licenses. Id.; Doc. 48-4 at 6. The certification requirements vary depending on the license; some certifications can be obtained by simply "signing a document," whereas others require the VAR to complete courses and pass an exam. Doc. 48-5 at 7; Doc. 48-6 at 18. If a VAR wishes to sell a particular license but lacks the certification to do so, it can submit a request to Oracle for a temporary exception to the certification requirement, which can be granted at Oracle's discretion. Doc. 48-4 at 6; Doc. 39-5 at 23.

Once a VAR identifies a customer's licensing needs, it works with a Value-Added Distributor (VAD) to obtain the necessary licenses from Oracle. Doc. 48-2 at 2. There are currently two VADs in the United States—TechData and Arrow—which all VARs must work through. Id. The VAD interfaces with Oracle to obtain the necessary licenses and then distributes the licenses to the VAR, who delivers the licenses to the end-use customer. Doc. 39-1 at 7.

Data Intensity is a VAR that typically obtains resale deals in one of two ways. First, it may obtain a resale deal as a result of an audit. Doc. 48-2 at 2. An audit is a service that Data Intensity performs for its customers, whereby Data Intensity analyzes the customer's Oracle usage and licensing to

determine whether it is in compliance with Oracle's licensing requirements. Id.; Doc. 39-1 at 12. If an audit reveals that a customer is out of compliance, Data Intensity may offer to resell the licenses needed to bring the customer into compliance. Doc. 39-1 at 12.

Customers may also be referred to Data Intensity by a third-party. For example, Oracle employees may bring opportunities directly to Data Intensity if they know of a user in need of resale. Doc. 39-5 at 24. Third-party companies that are engaged to solicit proposals for businesses in need of resale may also refer opportunities to Data Intensity. Doc. 39-3 at 6. Data Intensity views resale as a valuable part of its business because resale deals carry a high-profit margin and can lead to lucrative managed and professional services deals. Id. at 5; Doc. 49-4 at 10.

**B.    The Speros' Employment with Data Intensity**

Josh and Nate began working at Data Intensity in 2018. Doc 37-2 at 2; Doc. 37-3 at 2. Each brother came to Data Intensity with substantial experience in tech sales after having worked for several years as sales representatives at Oracle. Doc. 48-6 at 3-4; Doc. 48-2 at 1.

Nate was initially hired as the Regional Sales Director for the Southeast Region. Doc. 37-3 at 2. He later became the Sales Director for the East Region and was responsible for overseeing customer accounts across the

east coast. Doc. 26 at 6. In both roles, Nate was responsible for selling all

three of Data Intensity's core offerings. Id.; Doc. 39-4 at 30.

Josh was initially hired as the Regional Sales Director for the

Northeast Region where, like Nate, he was responsible for selling all of Data

Intensity's core offerings. Doc 37-2 at 2. In 2019, he was promoted to Vice

President of Sales for North America. Doc. 39-5 at 4. As Vice President, Josh

was responsible for overseeing Data Intensity's sales activity in North

America and supervising approximately twelve subordinate sales employees.

Id. at 8-9.

Upon receiving their offers of employment from Data Intensity, Nate

and Josh were presented with materially identical employment agreements.

Each agreement contained a non-disclosure clause, which provided that the

Speros would not "keep, disclose nor use any Confidential Information" at

any time either during or after their terms of employment. Doc. 37-2 at 2;

Doc. 37-3 at 2. The clause went on to define "Confidential Information" as "all

confidential and proprietary information of Data Intensity and its affiliates,"

including "information about [Data Intensity] that [the employee] may retain

in [his] memory[.]" Doc. 37-2 at 2-3; Doc. 37-3 at 2-3.

The agreements also included non-solicitation and non-compete

clauses. The non-solicitation clause prohibited the Speros from "solicit[ing] or

directly or indirectly servic[ing] or obtain[ing] business from any Customers

of Data Intensity or any of its affiliates (a) with whom [they] had contact as a result of [their] job duties with Data Intensity, and/or (b) about whom [they] reviewed or obtained Confidential Information while employed by Data Intensity" during the course of their employment with Data Intensity and for one year thereafter. Doc. 37-2 at 3; Doc. 37-3 at 3. The non-compete clause provided that the Speros may not "directly or indirectly, compete or undertake any planning to compete with Data Intensity or any of its affiliates" during the course of their employment with Data Intensity and for one year thereafter. Doc. 37-2 at 3; Doc. 37-3 at 3. It went on to provide that it "[s]pecifically" prohibited "work[ing] or provid[ing] services similar to those" that the employee provided to Data Intensity "to any person or entity that is engaged in any business or activity similar to or directly or indirectly competitive with that of Data Intensity or any of its affiliates in any territory to which [the employee was] assigned[.]" Doc. 37-2 at 3; Doc. 37-3 at 3.

## C.   Freedom Tech's Inception

By the fall of 2019, Data Intensity's performance had "deteriorated" to the point that the "company was unable to meet its debt[.]" Doc. 48-7 at 4. Consequently, Golub Capital, a private equity group with investments in the company, took control of Data Intensity. Id. at 4, 8-9. As part of its plan to revitalize the company, Golub laid off approximately 400 employees and installed a number of new executives, including a new Chief Executive

Officer. Doc. 48-2 at 3; Doc. 49-2 at 5. Given the uncertainty brought on by these changes, Data Intensity's Chief Revenue Officer told the Speros that they might lose their jobs and should "start thinking about a Plan B." Doc. 48-2 at 4.

Around that same time, Josh shared a drink with Phil LaForge, the newly-installed CEO, while the two were attending a conference. Doc. 49-3 at 10. According to Josh, LaForge told him that "the company would no longer have a resale quota for the United States" and that the sales team should not "focus on" or otherwise "pursu[e]" resale, but rather shift their efforts towards selling managed and professional services.[2] Id.; Doc. 48-2 at 4. Josh told Nate about his conversation with LaForge, and the Speros began discussing the possibility of starting their own resale business should they lose their jobs at Data Intensity. Doc. 48-2 at 4; Doc. 49-2 at 5.

In the following months, Data Intensity took a number of steps which the Speros viewed as confirmation that the company would be moving away from resale. According to Nate, LaForge told other members of the sales team that the company was "not going to focus on resale" and that sales representatives should only "focus[] on managed services and professional services." Doc. 39-4 at 6. Then, as part of its 2020 business plan, Data

---

[2]     LaForge denies that this conversation occurred. Doc. 49-4 at 9.

Intensity officially removed the resale quota for its North American sales representatives. Doc. 39-1 at 7. The Speros subsequently learned that some of the certifications required for Data Intensity to engage in resale had lapsed, including Data Intensity's e-business suite (EBS) certification, which was one of Data Intensity's "critical product[s]." Doc. 48-2 at 4.

Proceeding on the belief that Data Intensity was no longer pursuing resale, the Speros put into action their plan to start a resale-specific business. Id. at 4-5; Doc. 49-2 at 6. Freedom Tech was formally established as a New Hampshire limited liability company in October 2019. Doc. 39-9 at 2. As the sole members, Josh and Nate each received a 50% interest in the company. Doc. 24-3 at 2; Doc. 39-4 at 8.

In the months to follow, the Speros took additional steps to launch Freedom Tech as a VAR. Doc. 48-2 at 5. The Speros registered Freedom Tech as an Oracle-approved reseller and obtained the necessary certifications to resell certain licenses. Id.; Doc. 39-5 at 10. They set up Freedom Tech email accounts for themselves, as well as a generic email address for the company. Doc. 39-4 at 7; Doc. 39-5 at 19. Josh communicated with the two VADs and ultimately submitted an application to onboard Freedom Tech with TechData. Doc. 39-11 at 2; Doc. 39-12 at 2. Nate and Josh each reached out to their contacts at Oracle in hopes of obtaining business referrals for Freedom Tech. Doc. 39-4 at 13; Doc. 39-5 at 12. Nate also reached out to a friend at

NET(net), one of the third-party businesses that would collect proposals for companies in need of resale, so that he might direct resale opportunities to Freedom Tech. Doc. 39-4 at 6; Doc. 39-3 at 7. Although Nate and Josh continued to work at Data Intensity during this time, they kept Freedom Tech a secret from Data Intensity. Doc. 39-5 at 12; Doc. 39-4 at 13.

**D.    Freedom Tech's Dealings**

Once Freedom Tech became fully operational, Nate "managed 99 percent of the business" and was responsible for finding and executing the company's deals. Doc. 39-4 at 6; Doc. 39-5 at 10. Josh was "highly uninvolved" in the day-to-day operations of the company, and instead "left all of the business decisions to Nate[.]" Doc. 39-5 at 10; Doc. 48-2 at 5.

Freedom Tech secured its first deal in February 2020 and a second deal shortly thereafter, both of which were referred to Nate by his contacts at Oracle. Doc. 39-16 at 2; Doc. 39-4 at 17-18. Nate resigned from Data Intensity a few months later in May 2020 so that he could accept a full-time position with Amazon Web Services. Doc. 39-4 at 3; Doc. 39-2 at 3. Nonetheless, Nate continued to operate Freedom Tech part-time. Doc. 39-4 at 6. Meanwhile, Josh remained at Data Intensity as its Vice President of Sales.

1.    <u>The Mercury Deals</u>

In June 2020, one of Data Intensity's managed services customers, Mercury Systems, approached Josh about purchasing additional EBS licenses

from Data Intensity. Doc. 39-5 at 25. Mercury's interest was the result of an audit that Data Intensity had performed, which revealed that Mercury was out of compliance with Oracle's licensing requirements. Doc. 39-1 at 10. In order to avoid a potentially hefty fine from Oracle, Mercury wanted to purchase the necessary licenses as quickly as possible. Doc. 39-5 at 11. Both Mercury and Josh reached out to Oracle to discuss the purchase and were told that Data Intensity did not have the necessary certifications to sell Mercury the EBS licenses it required. Id. at 23; Doc. 49-3 at 6.

Josh did not discuss the matter with his superiors or seek an exemption from Oracle, but rather connected Mercury with Nate so that Freedom Tech could execute the sale. Doc. 39-5 at 11, 23; Doc. 48-2 at 5-6. Josh also sent an email from his Freedom Tech account "connect[ing]" Nate with two Oracle employees so that they could "work with Nate" on the deal. Doc. 39-28 at 4. Nate ultimately closed the deal with Mercury in July 2020, earning approximately $164,000 in net profits for Freedom Tech. Doc. 39-16 at 2. This eventually led to a second deal with Mercury several months later, which yielded a net profit of approximately $151,000. Id.

2.    The SAIC Deal

Over the course of the next year, Nate closed four additional deals on behalf of Freedom Tech, all of which were referred to him through his contacts at various third-party corporations. Id.; Doc. 39-4 at 18, 23, 26-27.

One of the deals was with SAIC, a pre-existing customer of Data Intensity. Doc. 39-1 at 10; Doc. 39-4 at 3.

The SAIC deal was initially presented to Nate by his friend, Matt Ryan, who worked at NET(net). Doc. 39-4 at 25. Ryan told Nate that SAIC wanted to collect proposals from a variety of VARs before settling on a seller. Doc. 39-5 at 27. Nate stated that Freedom Tech would submit a proposal but told Ryan that he should also present the opportunity to Data Intensity so that it could secure the deal if he could not. Id.

Ryan reached out to Josh, who assigned one of his sales representatives to pursue the deal. Id. Data Intensity attempted to register the deal with Oracle—that is, be the first to lay claim on the deal in order to obtain certain discounts—but its registration was rejected because another entity had already registered the deal. Id.; Doc. 39-10 at 5. Josh told his sales representative that this meant they were "competing on [the] opportunity with someone" and worked with the sales representative to develop a quote to submit directly to SAIC. Doc. 39-5 at 29; Doc. 39-10 at 3. Although Josh knew at the time that Freedom Tech was at least one of the other entities competing for the deal, he did not share this information with his team. Doc. 39-5 at 27. SAIC ultimately decided to give the deal to Freedom Tech in May 2021, which provided Freedom Tech with a net profit of over $65,000. Doc. 39-16 at 2.

E.     **Josh's Termination and the Present Litigation**

In July 2021, Josh was terminated from Data Intensity for performance-related issues. Doc. 39-5 at 9. Josh accepted his termination and, in exchange, Data Intensity agreed to release him from the non-compete provision of his employment agreement. Doc. 48-2 at 6. Josh then began working for Freedom Tech full time. Id.

In September 2021, Freedom Tech received a letter from Data Intensity "accusing it and Nate of various violations." Id. Shortly thereafter, Josh received an email from Data Intensity noting that he had not yet returned his company laptop and asking that he ship it back to the company immediately. Doc. 39-8 at 3. Before returning the laptop, Josh downloaded a large number of files onto an external hard drive, two thumb drives, and a cloud-based storage database. Doc. 39-5 at 31. Josh stated that he cast "a wide net" and "grabb[ed] everything" he could, including "data showcasing performance, company objectives, [and] quotas" as well as a complete copy of his Data Intensity email account, in the hopes that it could be used in his defense if Data Intensity were to file suit. Id. at 30-31.

Later that month, Data Intensity filed a complaint in this court against Josh, Nate, and Freedom Tech. Doc. 1 at 1. In its current form, the complaint alleges, among other things, that Josh and Nate breached their employment contracts and violated fiduciary duties they owed to Data Intensity by

improperly retaining and misusing Data Intensity's confidential information, soliciting Data Intensity's customers, and competing with Data Intensity. Doc. 24 at 22-29.

Freedom Tech continued to operate for a short period after this litigation began, but it closed its final deal and ceased operations in November 2021. Doc. 39-16 at 2; Doc. 48-2 at 7. All told, Freedom Tech consummated nine deals with seven customers over its lifetime, turning a net profit of over $1 million. Doc. 39-16 at 2; Doc. 39-26 at 6.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit[.]" Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

Where the movant does not bear the burden of proof on the dispositive issue, it need only "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); <u>accord</u> Irobe v. U.S.

Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Where, however, "the

movant bears the burden of proof at trial, [it] must demonstrate every

element of [its] case such that no reasonable trier of fact could find other than

for [it]." Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 411 (1st Cir.

2015) (cleaned up).

If the movant satisfies its burden, the burden shifts to the nonmovant

to designate "specific facts showing that there is a genuine issue for trial,"

Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could

reasonably resolve that issue in its favor." Irobe, 890 F.3d at 377 (cleaned

up). If the nonmovant fails to adduce such evidence on which a reasonable

factfinder could base a favorable verdict, the motion must be granted.

Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all

reasonable inferences in the nonmoving party's favor. Theriault v. Genesis

HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.   <u>ANALYSIS</u>

The current motions address only Data Intensity's breach of contract

claims and its breach of fiduciary duty claim against Josh.[3] Data Intensity

seeks a determination that Josh is liable as a matter of law on its breach of

---

[3]     Because the parties agree that New Hampshire law controls, I consider
their motions under the law of this state. Hershey v. Donaldson, Lufkin &
Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003).

contract claim because he violated the non-disclosure, non-solicitation, and non-compete clauses in his employment contract. It similarly argues that Nate is liable for violating the corresponding non-solicitation and non-compete clauses in his employment contract. The only breach of fiduciary claim that Data Intensity addresses in its current motion is its claim that Josh is liable for breach of fiduciary duty by competing against Data Intensity while he was still employed by the company.

The Speros attack Data Intensity's breach of contract claims by first arguing that the non-solicitation and non-compete clauses in their employment contracts are unenforceable because they restrict their right to work to a greater extent than is necessary to protect Data Intensity's legitimate business interests. In the alternative, they argue that Data Intensity cannot prove its claims even if the clauses are enforceable. Josh also argues that Data Intensity is not entitled to summary judgment on its breach of fiduciary duty claim because facts material to the resolution of that claim remain in genuine dispute. Data Intensity rejects these arguments and contends that both brothers are liable as a matter of law for breach of contract and Josh is similarly liable for breach of fiduciary duty.

I begin with Data Intensity's breach of contract claims and first assess the Speros' challenges to the enforceability of the non-solicitation and non-

compete clauses. I then examine the Speros' challenges to the sufficiency of the evidence supporting those claims.

## A.   Breach of Contract Claims

To succeed on a breach of contract claim under New Hampshire law, the plaintiff must show "(1) that a valid, binding contract existed between the parties, and (2) that [the defendant] breached the terms of the contract." Wilcox Indus. Corp. v. Hansen, 870 F. Supp. 2d 296, 311 (D.N.H. 2012). The Speros assert that Data Intensity has failed to sufficiently establish either element because the restrictive covenants in their employment agreements are unenforceable and, in any event, facts material to the resolution of Data Intensity's motion remain in genuine dispute.

### 1.   Enforceability of the Non-Solicitation and Non-Compete Clauses

"The public policy of New Hampshire encourages free trade and discourages covenants not to compete." Concord Orthopedics Prof. Ass'n v. Forbes, 142 N.H. 440, 442 (1997). Accordingly, a restrictive covenant is enforceable only to the extent that "the restraint is reasonable, given the particular circumstances of the case." ACAS Acquisitions (Precitech) Inc. v. Hobert, 155 N.H. 381, 388 (2007) (hereinafter ACAS). The reasonableness of a restraint presents a question of law that must be considered in light of the circumstances that existed at the time of execution. Technical Aid Corp. v. Allen, 134 N.H. 1, 8 (1991).

16

In determining whether a restrictive covenant is reasonable, courts look to (1) "whether the restriction is greater than necessary to protect the legitimate interests of the employer," (2) "whether the restriction imposes an undue hardship upon the employee," and (3) "whether the restriction is injurious to the public interest." ACAS, 155 N.H. at 389. "If any one of these questions is answered in the affirmative, the restriction in question is unreasonable and unenforceable." Id.

The first factor looks to "whether the restraint was narrowly tailored to protect the employer's legitimate interests." Id. The legitimate interests that an employer may seek to protect can vary depending on the context, but "must be direct and concrete rather than attenuated and speculative." Syncom Indus., Inc. v. Wood, 155 N.H. 73, 81 (2007). To be narrowly tailored to an employer's interests, the restraint must be "reasonable in both scope and duration[.]" ACAS, 155 N.H. at 394.

The second factor is evaluated by comparing "the consequences to the employer if the covenant is held invalid" with the "consequence to the employee if the covenant is held valid." Technical Aid, 134 N.H. at 14. "If enforcement makes the employee's task of making a living too difficult, the court may deny enforcement." 15 Corbin on Contracts § 80.15 (2023).

Finally, the third factor asks whether enforcing the covenant would adversely affect the public's right to choose among competing businesses or

otherwise threaten the accumulation of monopoly power. Technical Aid, 134 N.H. at 10-11. Importantly, however, "the mere fact of some limitation" to the public's right to choose whom to work with will not render a covenant unreasonable. Id. Rather, "[a] restrictive covenant must unreasonably limit the public's right to choose before it will be found to be injurious to the public interest." Id. (emphasis in original).

Even where a covenant is determined to be unreasonable, a court may nonetheless reform the covenant "if the employer shows that it acted in good faith in the execution of the employment contract." Merrimack Valley Wood Prods., Inc. v. Near, 152 N.H. 192, 200 (2005). To make this determination, the court must examine "all relevant circumstances" and consider whether the employer "has exploited an inherent imbalance [of bargaining power] by placing 'deliberately unreasonable and oppressive' restraints on the employee." Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 968 F.2d 1463, 1470 (1st Cir. 1992) (quoting Solari Indus., Inc. v. Malady, 264 A.2d 53, 57 (N.J. 1970)) (emphasis in original).

### a.   Non-Solicitation Clause

The non-solicitation clause states:

[D]uring your employment with Data Intensity, and for a period of one (1) year after you cease working for us for any reason, you will not, except in the normal and proper course of your duties for us, solicit or directly or indirectly service or obtain business from any Customers of Data Intensity or any of its affiliates (a) with whom you had contact as

a result of your job duties with Data Intensity, and/or (b) about whom you reviewed or obtained Confidential Information while employed by Data Intensity. You agree that refraining from solicitation means that you will not, except in the normal and proper course of your duties for us, have discussions with any Customers or prospective Customers, as described in this paragraph, concerning their doing business of the type they do with us with any other person or entity, nor will you induce or attempt to influence any Client to end their business relationship with us.

Doc. 37-2 at 3; Doc. 37-3 at 2. The term "Confidential Information" is defined in the non-disclosure clause as:

[A]ll confidential and proprietary information of Data Intensity and its affiliates, and shall include, but not be limited to, the following: Marketing Information, Client Information, Personnel Information, Corporate Information, Financial Information, Technical and Computer Information, and Work-Related Documents and Materials. Confidential Information also includes information about us that you may retain in your memory, as well as information that is recorded in documents or in electronic form. Confidential Information shall not include information that is or becomes generally known to the public through no action on your part, is generally disclosed to third parties by us, without any restrictions.

Doc. 37-2 at 2-3; Doc. 37-3 at 2-3.

The Speros primary contention is that the non-solicitation clause is unreasonable because it extends to an overly broad class of customers. Data Intensity responds that the non-solicitation clause is narrowly tailored to its interests in maintaining customer goodwill and preventing the misappropriation of its confidential information. I agree with Data Intensity.

The case law is clear, and the Speros do not dispute, that the maintenance of confidential information and customer goodwill are legitimate

interests that may justify the use of a non-solicitation agreement. See, e.g., Wood, 155 N.H. at 79-80. Because employees may leverage an employer's confidential information or customer goodwill to obtain a competitive advantage, employers have a legitimate interest in ensuring that such assets are not used to their detriment. See CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 59 (1st Cir. 2020); ACAS, 155 N.H. at 389.

Here, the non-solicitation clause is appropriately tailored to these legitimate interests. It restricts the Speros' actions for only one year following the termination of their employment. See Technical Aid, 134 N.H. at 14 (concluding that 18 months was a reasonable amount of time for customer goodwill to dissipate). Moreover, it does not restrict the Speros' interactions with all of Data Intensity's customers, but rather only those customers that the Speros had contact with or obtained confidential information about during the course of their employment with Data Intensity.

It is well established that employers are generally able to protect their interest in customer goodwill by prohibiting the solicitation of customers with whom the employee had contact. See Near, 152 N.H. at 198-199. But an employer may prohibit the solicitation of an even broader class of customers where necessary to protect its confidential customer information. Wood, 155 N.H. at 80. Thus, the New Hampshire Supreme Court has recognized that employers may prohibit the solicitation of "customers with which the

employee had no direct contact, so long as the employee gained significant knowledge or understanding of those customers during the course of his or her employment." Id.; see also Technical Aid, 134 N.H. at 13 (upholding a non-solicitation clause that prohibited former employees from "compet[ing] for accounts . . . which became known to him through his employment with [the employer]"). The non-solicitation clause here fits squarely within these precedents.

The Speros nonetheless assert that the non-solicitation clause extends beyond what is reasonably necessary to protect Data Intensity's legitimate interests for at least three reasons. First, they contend that the employment agreement's broad definition of confidential information arguably encompasses information that Data Intensity has no legitimate interest in protecting. The Speros note that, because the definition of confidential information includes information retained in their memories but is not explicitly limited to information learned through their employment at Data Intensity, it could include information that the Speros learned through their other previous employment.

The Speros argument misapprehends the reach of the term "confidential information" as it is used in the contract. The definition of confidential information appears within the agreement's non-disclosure clause which, admittedly, is not a model of clarity. Although the definition

itself does not explicitly limit its application to information learned while at Data Intensity, it follows a preamble which makes clear that the clause as a whole is directed towards information "learn[ed]" or "develop[ed]" "[d]uring the course of [the employee's] employment with Data Intensity[.]" Doc. 37-2 at 2; Doc. 37-3 at 2. Moreover, the definition is limited to "confidential and proprietary information of Data Intensity and its affiliates" and thus would not extend to information provided to the Speros by other previous employers. Doc. 37-2 at 2; Doc. 37-3 at 2. Were there any remaining doubt about the reach of the phrase "confidential information" as it is used in the non-solicitation clause, that doubt is resolved by the non-solicitation clause's statement that it applies only to confidential information obtained "while employed by Data Intensity." Doc. 37-2 at 3; Doc. 37-3 at 3. Thus, reading the contract as a whole, the non-solicitation clause only extends to Data Intensity's confidential information that the Speros acquired during the course of their employment at the company. Data Intensity certainly has a legitimate interest in guarding against the misuse of such information, regardless of whether the information is retained in writing or in an employee's memory. Cf. Orthofix, Inc. v. Hunter, 630 F. App'x 566, 571 (6th Cir. 2015) ("non-disclosure provisions may protect information maintained in an employee's memory."); Invacare Corp v. Nordquist, No. 1:18-cv-62, 2018

WL 2454523, at *6-7 & n.67 (N.D. Ohio June 1, 2018); Compass Bank v.

Hartley, 430 F. Supp. 2d 973, 977 n.3, 982 (D. Ariz. 2006).

Second, the Speros argue that the non-solicitation clause is

unreasonable to the extent that it prohibits them from soliciting customers of

any of Data Intensity's "affiliates." In the Speros' view, because the term

"affiliates" is undefined in the agreement, it could encompass "any other

person, customer, business, or other entity with which Data Intensity has

been 'affiliated' with since its inception[.]" Doc. 37-1 at 13. Prohibiting the

solicitation of such a broad swath of entities, the Speros contend, would

essentially bar the Speros from being involved in the tech industry anywhere

in the world.

But again, this argument rests on a misreading of the contract. The

Speros argument seems to invoke a definition of "affiliate" that applies when

it is used colloquially as a verb. See Affiliate, Merriam-Webster,

https://www.merriam-webster.com/dictionary/affiliate [https://perma.cc/Z2T4-

5DWV] (last visited Mar. 19, 2024) ("to connect or associate oneself"). But

here, the word "affiliate" is used as a noun in the corporate context. When

used in this way, "affiliate" means a "corporation that is related to another

corporation by shareholdings or other means of control;" that is, a "a

subsidiary, parent, or sibling corporation." Affiliate, Black's Law Dictionary

(11th ed. 2019). Thus, the non-solicitation clause extends only to customers of

Data Intensity's formally-related corporations that the Speros either had contact with or obtained confidential information about.

While it is true that this could potentially extend the non-solicitation clause to include customers of organizations other than Data Intensity itself, the restriction is still fundamentally aimed at preventing the misappropriation of Data Intensity's own goodwill and confidential information. Given the interdependence of affiliated corporations, Data Intensity has an interest in ensuring that its assets are not misappropriated to harm one of its affiliates. Cf. Ferrofluidics Corp. v. Advanced Vacuum Corp., 789 F. Supp. 1201, 1209-1210 (D.N.H.), aff'd, 968 F.2d 1463 (1st Cir. 1992) (finding that a covenant prohibiting "compet[ing] with any business conducted by the Company or by any affiliate" was reasonable and enforceable).

Finally, the Speros assert that the non-solicitation clause is unreasonable because it also extends to "prospective customers." It is true that, as a general rule, employers may not prohibit the solicitation of all of a company's potential customers because an employer has no legitimate interest every entity that could one day become its customer. See Forbes, 142 N.H. at 443. Importantly, however, the non-solicitation clause here does not prohibit the Speros from doing business with any of Data Intensity's prospective customers. Rather, it is only those prospective customers that the

Speros had contact with or obtained confidential information about while employed at Data Intensity. Cf. id. (finding that a non-solicitation clause was unreasonable where it prohibited the solicitation of any potential customers, regardless of whether the employee had contact with or knowledge of those customers). While Data Intensity may not have a legitimate interest preventing the Speros from working with all of its prospective customers, it still has an interest in guarding against the misuse of its goodwill and confidential information, which can be deployed against prospective customers as well as existing customers. See Technical Aid, 134 N.H. at 13 ("When [an employee] has gained extensive knowledge of a customer through his employment, [the employer] has a legitimate interest in preventing [the employee] from using that knowledge to [its] detriment.").

This is particularly true in the context of this case. The Speros were not peddling a generic product to the general public, but rather seeking to sell a bespoke collection of licenses specifically tailored to the end-user's needs. In this context, it is easy to see how a salesperson could use information gained through previous client contact or his employer's internal channels to develop a compelling package for the customer, thus giving him a unique advantage over his employer. Because Data Intensity has an interest in preventing such a misuse of its assets, the fact that the non-solicitation clause applies to prospective customers does not render it unreasonable. Having rejected the

Speros' arguments to the contrary, I conclude that the non-solicitation clause is narrowly tailored to protect Data Intensity's legitimate interests in customer goodwill and confidential information.

The Speros' claim that the non-solicitation clause constitutes an undue hardship for them is also unpersuasive. They remain free to pursue work as salesmen, so long as they do not sell to a narrow subset of customers, and therefore they are not unduly restricted in their chosen occupation. Cf. 15 Corbin on Contracts § 80.15 (2023).

Nor does the non-solicitation clause harm the public interest. While it is true that enforcement of the non-solicitation clause will restrict the ability of certain customers to buy from Nate or Josh, there is no indication that it would "unreasonably limit the public's right to choose," particularly given that there are thousands of other VARs in the United States from which to choose. Technical Aid, 134 N.H. at 10 (emphasis in original); see Doc. 39-5 at 6.

In sum, I conclude that the non-solicitation clause is reasonable and therefore should be enforced as written.

### b.   Non-Compete Clause

The non-compete clause in the Speros' employment agreements states that:

[D]uring your employment with Data Intensity, and for one (1) year thereafter, you will not, directly or indirectly, compete or undertake any planning to compete with Data Intensity or any of its affiliates, whether as an owner, partner, investor, independent contractor, employee or otherwise.

Doc. 37-2 at 3; Doc. 37-3 at 3.

It then goes on to provide:

Specifically, without limiting the foregoing, you agree not to work or provide services similar to those that you provide or have provided to or for the benefit of Data Intensity or any of its affiliates, whether as employee, independent contractor or otherwise, whether with or without compensation, to any person or entity that is engaged in any business or activity similar to or directly or indirectly competitive with that of Data Intensity or any of its affiliates in any territory to which you were assigned during your employment or other association with Data Intensity or any of its affiliates.

Doc. 37-2 at 3; Doc. 37-3 at 3.

Although fashioned as a single clause, the non-compete clause proceeds in two-parts, each of which impose different restrictions. The first sentence ("Part A") specifies that during employment and for a year thereafter, the employee "will not, directly or indirectly, compete or undertake any planning to compete with Data Intensity or any of its affiliates." The second sentence ("Part B") does not include a temporal limitation but it otherwise more narrowly states that an employee agrees "not to work or provide services similar to those that you provide or have provided to or for the benefit of Data Intensity or any of its affiliates . . . in any territory to which you were assigned during your employment or other associates with Data Intensity or

27

any of its affiliates." Because the two non-compete provisions differ in scope, I analyze them separately. Cf. Technical Aid, 134 N.H. at 9-11 (separately analyzing the reasonableness of different restrictions contained in the same contractual clause).

           i.      Part A

Part A broadly prohibits "directly or indirectly" competing or planning to compete with Data Intensity during an employee's term of employment and for one year thereafter. Doc. 37-2 at 3; Doc. 37-3 at 3. Because Data Intensity has an absolute interest in its current employees' "undivided loyalty," it is reasonable for Data Intensity to prohibit any competitive activity during an employee's tenure. Technical Aid, 134 N.H. at 17 (enforcing a covenant that prohibited employees "from engaging in activity competitive to [the employer] while in its employ").

This interest dissipates, however, once the employment relationship ends, and therefore Data Intensity cannot justify a broad prohibition on competition that extends beyond the term of employment. While post-employment restrictions on competition may be justified by the employer's interest in protecting customer goodwill or confidential information, the restriction generally must be "limited to the geographic area in which the employee had client contact in order to satisfy the 'narrowly tailored' test[.]" Near, 152 N.H. at 198; see also Forbes, 142 N.H. at 444. Part A contains no

such limitation, and therefore it unreasonably prohibits former employees

from engaging in competitive activity anywhere in the world.[4]

Data Intensity argues that Part A can be saved even if it is overbroad

because New Hampshire law permits a court to reform an overbroad

covenant when the employer adopted it in "good faith."[5]  Near, 152 N.H. 200.

The Speros assert that, because the non-compete clause is "facially overbroad

under existing New Hampshire case law," Data Intensity cannot demonstrate

that it acted in good faith. Doc. 37-1 at 17.

While it is true that a lack of good faith "may be manifested by [a

restrictive covenant's] gross overbreadth alone," the restriction at issue here

is not so "egregiously overbroad" as to defeat a showing of good faith. 15

Corbin on Contracts § 80.26 (2023) (quoting Restatement of Employment Law

§ 8.08 (2015)). Rather, the terms of the non-compete clause are "merely

marginally overbearing so as to suggest that [Data Intensity] simply

---

[4]    Data Intensity contends that, because Part B states that its restrictions
only apply to the employee's assigned territory, I should read the same
limitation into Part A. But, because Part B specifically provides that it does
not "limit[]" Part A, its terms cannot be read to narrow the reach of Part A.

[5]     In arguing that the restriction is reasonable, Data Intensity points to
the fact that the Speros "agree[d] that [the] restraints against solicitation and
competition are necessary . . . [and] reasonable" when they signed the
employment agreements. Doc. 37-2 at 4; Doc. 37-3 at 4. However, "[t]he
determination of whether a covenant is reasonable is a matter of law for th[e]
court to decide." Technical Aid, 134 N.H. at 8. Therefore, I afford no weight to
the fact that the contract stated the restraint was reasonable.

miscalculated the extent of the restrictions required for its reasonable protection." Ferrofluidics Corp., 968 F.2d at 1471.

Moreover, Data Intensity's conduct in executing the agreement indicates that it entered into the contract in good faith. Data Intensity presented the employment agreement to the Speros weeks before their employment was set to begin, thereby giving them ample time to negotiate or else reject the terms of the contract. Cf. Smith, Batchelder & Rugg v. Foster, 119 N.H. 679, 685 (1979) (finding an absence of good faith where the employees were required to "execute[] their employment agreements after they were hired"). The Speros were afforded several days to review the contract before signing it such that they had time to understand its terms and, if desired, consult with an attorney. Cf. Technical Aid, 134 N.H. at 18 (finding an absence of good faith where the employer "insist[ed] that [the employee] sign the contract immediately"). And the restrictive covenants were not buried in a lengthy contract or handbook, but rather prominently displayed in a four-page offer letter. See Ferrofluidics Corp., 968 F.2d at 1471 (noting that "whether the employer gave the particular employee a reasonable opportunity to read and understand the covenant" is relevant the determination of good faith).

Because Data Intensity entered into the non-compete agreement in good faith, it is entitled to modification. Therefore, I strike the portion of Part

A stating that it applies for one year after the end of the term of employment, but will enforce the clause to the extent that it prohibits current employees from "directly or indirectly, compet[ing] or undertak[ing] any planning to compete with Data Intensity or any of its affiliates."

          ii.    Part B

In contrast to Part A, Part B prohibits a much narrower subset of activities. Part B bars both current and former employees from (1) "work[ing] or provid[ing] services similar to those" that the employee provided to Data Intensity (2) for "any person or entity that is engaged in any business or activity similar to or directly or indirectly competitive with that of Data Intensity or any of its affiliates" (3) "in any territory to which [the employee was] assigned" (4) throughout the term of employment and for one year thereafter.[6] Doc. 37-2 at 3; Doc. 37-3 at 3.

Prohibiting current and former employees from providing "similar" "work" or "services" for businesses that engage in "similar" or "competitive" activity is warranted to protect Data Intensity's interest in customer goodwill

---

[6] The temporal limitation appears only in Part A and is not explicitly reiterated in Part B. Nonetheless, reading the clause as a whole, it is clear that Part B adopts Part A's temporal limitation. Part B serves to identify a "specific[]" subset of competitive behavior that is prohibited Part A, and therefore incorporates all the limitations of Part A.

and confidential information.[7] If an employee were to provide similar services to a competitor, there is a risk that goodwill properly owed to Data Intensity would "follow the employee" to his new job. 15 Corbin on Contracts § 80.16 (2023); see ACAS, 155 N.H. at 389 ("when an employee holds a position involving client contact, it is natural that some of the goodwill emanating from the client is directed to the employee rather than to the employer, and the employer has a legitimate interest in preventing its employees from appropriating this good will to its detriment.").

Similarly, allowing a former employee who had access to his employer's confidential information to perform similar duties for a new employer creates a risk that the employee will misuse the confidential information when performing similar duties for a new employer, even if inadvertently. See Lavin, 951 F.3d at 59 (noting that, where a former employee had "extensive knowledge" of his former employer's "strategic initiatives and detailed information about its contacts," it "strains credulity" to think that he could "develop a strategy for [his new company] without dipping into this

---

[7]    Although inartfully drafted, I do not read the clause as prohibiting former employees from working at a competitive enterprise in any capacity. Rather, it only restricts former employees from providing a competitive enterprise with "work . . . similar to" that provided to Data Intensity. See Technical Aid, 134 N.H. at 13 ("our own rules of construction prohibit us from interpreting a contract so as to make it illegal when there is an obvious interpretation which would give it legal effect.").

knowledge"); Nat'l Med. Care, Inc. v. Sharif, No. 20-11460-MBB, 2020 WL 6318922, at *11 (D. Mass. Sept. 2, 2020) (noting that, where an employee accepts a position providing "substantially similar duties" to a competitor, "the likelihood that he will disclose or use confidential information acquired at [his former employer] is substantial and real"). The restriction in Part B reaches only as far as these "direct and concrete" threats to Data Intensity's legitimate interests, and therefore is appropriately limited in scope. Wood, 155 N.H. at 81.

The geographic restriction is also reasonable. The New Hampshire Supreme Court has recognized that employers can generally restrict competition within the geographic area where "the employee had client contact, as that is usually the extent of the area in which the employer's goodwill is subject to appropriation by the employee." Technical Aid, 134 N.H. at 10; accord 15 Corbin on Contracts § 80.17 (2023). "For salespersons, this area often corresponds to the territory to which they are assigned to make sales." Technical Aid, 134 N.H. at 10. Part B tracks this general rule by prohibiting only competition within the Speros' assigned sales territory.

The Speros, nonetheless, contend that the geographic limitation is insufficient. In the Speros' view, because the contract does not specifically define their assigned territory, the restriction could apply anywhere in the world that Data Intensity conducts business. This reading of the agreement

proves too much. Undefined terms in a contract are not given their maximalist meaning, but rather their ordinary meaning. Logic Assocs., Inc. v. Time Share Corp., 124 N.H. 565, 572 (1984). Here, a plain reading of the contract in context indicates that the "territory in which [the employee was] assigned" refers to the geographic area where each brother was assigned to make sales. See Doc. 49-4 at 7 (describing sales territory assignments and how they evolved).

This restriction also "is not so vague as to render the covenant unreasonable per se," particularly in light of evidence that the Speros understood its reach. See Technical Aid, 134 N.H. at 9. For one, the Speros' job titles referenced their territory assignments. Doc. 37-2 at 2 (offering Josh a position as "Regional Sales Director—Northeast"); Doc. 37-3 at 2 (offering Nate a position as "Regional Sales Director—Southeast Region"); Doc. 47-3 at 5 (noting Josh's subsequent position as "Vice President of Sales, North America"). Nate was able to describe his assigned territory, even after it was expanded beyond what was reflected in his initial title. See Doc. 39-4 at 21 (Nate testifying as to the areas he was assigned to "cover[]" when his territory expanded from the southeast United States to the entire east coast). Moreover, the Speros received yearly commission plans that provided a "territory description." Doc. 39-30 at 3; Doc. 39-31 at 3; Doc. 39-32 at 3; Doc.

39-33 at 3. Accordingly, the clause's limitation to the Speros' assigned territory is both sufficiently defined and reasonable.

I am unpersuaded by the Speros' contention that the restriction imposes an undue hardship. To be sure, given the impressive span of the Speros' assigned territories, the restriction encompasses a significant area. Most notably, because Josh covered sales across all of North America, his non-compete clause applied to the entire continent. While such an expansive geographic reach could prove problematic in other contexts, here it is reasonable given the narrow scope of the prohibited activities. The Speros remain free to pursue work within their assigned territory, so long as their work does not entail offering services similar to those of Data Intensity. Thus, the Speros may continue to work as salesmen anywhere they please, so long as they do not sell certain Oracle-related products and services. Indeed, both Josh and Nate have since secured non-breaching employment selling other IT-related products and services.[8] Doc. 47-3 at 5; Doc. 39-4 at 3-4; see

---

[8]      The Speros contend that I should not consider post-execution facts in determining the enforceability of the non-compete clause because the reasonableness inquiry looks to "the time when the contract was entered into." Technical Aid, 134 N.H. at 8 (quoting Seaboard Indus., Inc. v. Blair, 178 S.E.2d 781, 786 (1971)). The Speros are certainly correct that the fundamental question is "whether the covenant was reasonable when signed[.]" Id. at 14. This does not, however, mean that courts must turn a blind eye to post-execution facts when applying the reasonableness test. That the Speros were able to secure non-breaching employment is evidence that

also Doc. 47 at 15 (conceding that the Speros' current employment is not in breach).

Finally, the restriction is not harmful to the public. In particular, given evidence that there is ample competition in the resale market, there is no basis on which to conclude that prohibiting the Speros from operating a new resale business would "unreasonably limit the public's right to choose, or tend to create monopoly power." Technical Aid, 134 N.H. at 16; see also Doc. 39-5 at 6 (noting that there are "thousands of [VARs] in North America").

Part B therefore satisfies all three prongs of the reasonableness test and is enforceable as written.

2.     Liability for Breach

Having concluded that the Speros' employment agreements are enforceable, the question becomes whether Data Intensity has adequately demonstrated that the Speros breached their contracts. I consider the evidence against each defendant in turn.

a.     **Josh's Liability**

---

the non-compete, as written at the time of its execution, was not so sweeping as to prevent the Speros from engaging in their chosen occupation and undermines their claim that enforcement of the non-compete would "result in the Speros' de facto unemployment for at least a year[.]" Doc. 37-1 at 15. See Technical Aid, 134 N.H. at 16 (considering a defendant's new position in determining whether his former employer's restrictive covenant imposed an undue hardship).

Data Intensity seeks summary judgment as to Josh's liability for breach of the non-disclosure, non-solicitation, and non-compete clauses. For the reasons that follow, I conclude that Data Intensity is entitled to summary judgment on its claim that Josh breached his employment agreement.

i.    Non-Disclosure Clause

The non-disclosure clause in Josh's agreement states:

> During the course of your employment with Data Intensity, you will learn of Confidential Information . . . and you may develop Confidential Information on behalf of Data Intensity and its affiliates. As an employee, you agree that you will neither keep, disclose nor use any Confidential Information, or copies of Confidential Information, whether for your own purposes or on behalf of any other person or entity, at any time, except as required in the normal and proper course of your duties for us or by applicable law . . . You agree that this restriction will continue to apply after your employment terminates, regardless of the reason for such termination.

Doc. 37-2 at 2-3.

Data Intensity asserts that Josh violated the non-disclosure clause in at least two ways: first, by providing Nate with confidential information about Mercury and, second, by downloading copies of confidential documents from his work laptop following his termination.

Regarding the Mercury deal, Data Intensity alleges that Josh provided Nate with "Mercury's contact information and the exact products Mercury needed" when he referred Mercury to Freedom Tech. Doc. 39 at 21. Josh

argues that Mercury voluntarily provided Nate with its audit information and that Mercury's contact information, standing alone, is not confidential.[9]

It is true that customer information, including customer needs, may be considered confidential information. See, e.g., PC Connection, Inc. v. Sillich, 673 F. Supp. 3d 131, 136 (D.N.H. 2023); Corp. Technologies, Inc. v. Harnett, 943 F. Supp. 2d 233, 240 (D. Mass. 2013). But the record is unclear as to what information, specifically, Josh gave to Nate when referring Mercury to Freedom Tech. Although Josh admits that he "moved [Mercury] over to Nate in terms of an introduction and how he could help," he does not explain what sort of information he gave Nate about Mercury or its needs. Doc. 39-5 at 10. Absent such details, Josh's vague admission cannot conclusively establish that he provided Nate with confidential information about Mercury's needs.

Although Josh does not appear to dispute that he provided Nate with Mercury's contact information, I cannot conclude on the present record that this information qualified as confidential information. There is no evidence of what contact information Josh passed to Nate, nor is there evidence that this

---

[9]     To be precise, this argument was raised by Nate in his objection to Data Intensity's motion for summary judgment before it was made clear that Data Intensity was not moving for summary judgment on its breach of the non-disclosure agreement claim against Nate. However, because Josh adopted all arguments advanced by Nate that bear on his own liability, I consider the argument as fairly incorporated into Josh's objection. Doc. 48-1 at 1.

contact information was confidential rather than publicly available. While Data Intensity may be able to prove at trial that Josh provided Nate with confidential information when he referred the Mercury deal to Freedom Tech, it has not produced sufficient evidence to establish its right to summary judgment on this claim.

Data Intensity has, however, demonstrated that it is entitled to summary judgment on its claim that Josh breached the non-disclosure clause by retaining documents from his work laptop. Josh contends, first, that there is insufficient evidence that the retained documents were confidential. However, LaForge averred that he reviewed many of the retained documents and concluded that each of the documents he reviewed contained "customer, financial, margin [or] other competitive financial information." Doc. 39-2 at 2-3. Josh does not offer any evidence to rebut this assertion, but rather admits that he retained "data showcasing performance, company objectives, [and] quotas." Doc. 39-5 at 31.

Moreover, although Josh contends that "much of the information" retained from his computer was not confidential, he does not appear to dispute that at least some of the information was confidential. Doc. 48-1 at 16. Because the agreement prohibits the retention of "any Confidential Information," whether all or merely some of the information was confidential is irrelevant to the question of liability. Doc. 37-2 at 2.

Josh next contends that, even if the retained information was confidential, Data Intensity is not entitled to summary judgment because there is no evidence that he used the information for the benefit of himself or Freedom Tech. But the non-disclosure clause prohibits, not merely the "use" of confidential information, but also the "keep[ing]" of confidential information. Id. In other words, the non-disclosure clause is violated whenever an employee fails to return or destroy Data Intensity's confidential information, regardless of whether that information is ever used.

Whether Josh used the confidential information to Data Intensity's detriment is relevant to the question of damages. But, under New Hampshire law, a plaintiff need not demonstrate that it suffered damages in order to establish liability for breach of contract. See In re Pope, 647 B.R. 597, 617-618 (Bankr. D.N.H. 2022) (collecting cases). Instead, a plaintiff may recover nominal damages for breach of contract, even in the absence of actual damages. See, e.g., Zareas v. Smith, 119 N.H. 534, 537 (1979); Pugliese v. Town of Northwood Plan. Bd., 119 N.H. 743, 751 (1979); accord Restatement (Second) of Contracts § 346 (1981). Because Data Intensity is not required to demonstrate that it suffered damages for the purposes of liability, and because the non-disclosure clause prohibits the mere retention of confidential information, it is of no consequence that Josh may not have used the confidential information to Data Intensity's detriment.

In sum, Data Intensity is entitled to summary judgment on its claim that Josh is liable for breaching the non-disclosure agreement, but only on the theory that he did so by retaining copies of confidential information from his company laptop.

ii.      Non-Solicitation Clause

As I have explained, the non-solicitation clause prohibited Josh from "solicit[ing] or directly or indirectly servic[ing] or obtain[ing] business from" customers that he either had contact with or obtained confidential information about while employed by Data Intensity. Doc. 37-2 at 3. The clause further specifies that the prohibition against solicitation bars engaging in "discussions with any Customers or prospective Customers . . . concerning their doing business of the type they do with [Data Intensity] with any other person or entity." Id. Data Intensity asserts that Josh breached the non-solicitation clause by obtaining business from Mercury and SAIC through Freedom Tech.

It is undisputed that Josh communicated with Mercury during his employment with Data Intensity and specifically worked with Mercury on resale. Doc. 39-5 at 12, 25; Doc. 49-11 at 2; Doc. 39-1 at 10. It is further undisputed that Josh referred Mercury to Nate so that Mercury could purchase the EBS licenses it required from Freedom Tech. Doc. 39-5 at 10; Doc. 48-2 at 5-6. And it is undisputed that Freedom Tech closed two deals

with Mercury while Josh was employed by Data Intensity and that Josh, as a

50% owner of Freedom Tech, profited from those deals. Doc. 39-16 at 2.

These undisputed facts establish that Josh breached the non-

solicitation clause in at least two ways. First, by referring Mercury to Nate,

Josh engaged in discussions with Mercury "concerning their doing business of

the type they [did] with [Data Intensity]" with another entity. Doc. 37-2 at 3.

Second, Josh "obtain[ed] business from" Mercury when his company closed

two deals with Mercury. Id.

Josh does not present a developed argument as to why the Mercury

transactions should not be considered a breach, beyond reiterating his claim

that Data Intensity could not provide Mercury with the EBS licenses it

required.[10] But the non-solicitation clause applies to any customers that Josh

had contact with through his work at Data Intensity, regardless of whether

_____

[10]     Josh states in passing that, because Mercury was an ongoing "managed
services client" at Data Intensity, he was "maintaining the client
relationship" by referring Mercury to a company that could meet its urgent
resale needs. Doc. 48-1 at 15. To the extent Josh is arguing that his actions
were "in the normal and proper course of [his] duties" for Data Intensity such
that they were exempted from the non-solicitation clause, his argument is
insufficiently developed and therefore does not warrant further consideration.
Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999).
In any event, the evidence would not appear to support such a contention.
There is no evidence in the record that Data Intensity employees would
normally provide referrals to competitors for transactions that Data Intensity
could not facilitate. Moreover, that Josh kept his communications with
Mercury from Data Intensity indicates that they were not in service of Data
Intensity. Doc. 39-5 at 12.

Data Intensity had the capacity to continue servicing those customers. Thus, even if Josh is correct that Data Intensity could not have obtained the Mercury deal, it would not preclude summary judgment.

Data Intensity has not, however, demonstrated that it is entitled to summary judgment on its claim that Josh breached the non-solicitation clause by obtaining business from SAIC. Construing the record in the light more favorable to Josh as the non-moving party, there is insufficient evidence that Josh had contact with or obtained confidential information about SAIC while at Data Intensity. After learning about the SAIC opportunity, Josh discussed the deal with Ryan, Nate's friend at NET(net), "one time" before "offload[ing] it" to one of his subordinate sales representatives. Doc. 39-5 at 28. Although Josh stated that he "worked with [his sales representative] to get a quote in front of SAIC," there are no details in the record as to what that process entailed. Id. at 29. While it is certainly possible, and perhaps even likely, that Josh was exposed to confidential information while helping his sales representative to prepare a quote for SAIC, I cannot conclude as much for the purposes of summary judgment.

Therefore, Data Intensity is entitled to summary judgment on its claim that Josh is liable for the Mercury deals, but not on its claim that Josh is liable for the SAIC deal.

iii.    Non-Compete Clause

Data Intensity asserts that Josh breached the non-compete agreement by establishing and launching Freedom Tech, a competitor in the resale industry, while he was employed by Data Intensity.[11]

Josh asserts that Data Intensity is not entitled to summary judgment because a genuine dispute exists as to whether Freedom Tech competed with Data Intensity. Josh notes that Freedom Tech only engaged in resale but contends that, by the Fall of 2019, Data Intensity had "withdrawn from actively pursuing" resale. Doc. 48-1 at 12. Josh does not dispute Data Intensity's assertion that it continued to close resale deals throughout Freedom Tech's existence, but rather argues that Data Intensity "de-emphasi[zed]" resale in order to focus its efforts on selling managed and professional services prior to Freedom Tech's inception. Doc. 63 at 3.

In this way, Josh's argument appears to be premised on the assumption that, if resale was merely a secondary or de minimis aspect of Data Intensity's overall business, then Freedom Tech did not compete with Data Intensity by engaging in resale. The New Hampshire Supreme Court, however, rejected a similar argument in Technical Aid. In that case, a

---

[11]    Data Intensity released Josh from his non-compete agreement following his termination. Therefore, it only seeks to hold him liable for his actions during his term of employment.

business that placed temporary employees sued its former employee for breach of a non-compete agreement after he started his own temporary employment agency. Technical Aid, 134 N.H. at 6-7. The defendant argued that he had not competed with his former employer because his business "place[d] exclusively construction laborers" whereas the employer's business "place[d] primarily technical personnel." Id. Although it was undisputed that the employer's primary focus was on placing technical personnel, the evidence indicated that the employer was open to accepting business placing construction workers and that placing construction workers was at least a small aspect of the employer's business. Id.

The court stated that the defendant's argument was "semantic at best," and that "it defies logic to assert that competition is not involved" when "one company replaces another as a supplier of a given service to a specific customer," regardless of whether the service at issue constituted a major or minor part of the employer's overall business. Id. Thus, the court concluded that the defendant "need not challenge [his employer] across the board to be competing with [it] for business" and that it was no defense that the employer's "penetration of the construction temporaries market [was] small, or even embryonic[.]" Id.

Similarly here, that resale may have been only a minimal part of Data Intensity's business does not mean that Freedom Tech was not a competitor

of Data Intensity.[12] The question is not whether resale was a major focus of Data Intensity's business, but whether Data Intensity offered resale at all such that customers would need to choose between Data Intensity and Freedom Tech for their resale needs. See Logic Assocs., Inc., 124 N.H. at 570.

The undisputed evidence, even when viewed in the light most favorable to the Speros, clearly indicates that Data Intensity was at least somewhat active in the resale market throughout the entirety of Freedom Tech's existence. Although the Speros point to evidence that resale profits remained "essentially flat" and constituted only a "tiny portion" of Data Intensity's overall profits after 2019, they do not dispute that Data Intensity continued to execute resale transactions throughout 2019 and into 2021. Doc. 49-1 at 6; see Doc. 63 at 3; Doc. 48-1 at 12; Doc. 49-10 at 2-3.  Indeed, LaForge averred that Data Intensity "profited over $6,000,000 in Resale transactions" between October 2019 and August 2022 "in the United States alone," and the Speros have not offered any evidence to the contrary.[13] Doc. 39-2 at 3. Moreover,

---

[12]    The result could be different if the contract only prohibited, for example, "material competition" or competition with the employer's "primary business." See, e.g., EarthWeb, Inc. v. Schlack, 71 F. Supp. 2d 299, 307 (S.D.N.Y. 1999); Victoria's Secret Stores v. May, 157 S.W.3d 256, 261 (Mo. Ct. App. 2004). The non-compete clause at issue here, however, contained no such limitation.

[13]    While Josh does not dispute the accuracy of this statement, he nonetheless asserts that a large portion of these profits were the product of a

Data Intensity offers uncontroverted evidence that it would need to obtain board approval before exiting resale entirely, yet the board was never presented with such a proposal.[14] Doc. 58-7 at 7.

Perhaps most tellingly, Josh himself continued to engage in resale on behalf of Data Intensity. For example, when Data Intensity's audit of Mercury's system revealed the need for additional licenses, Josh "tried to close [a] license deal with Mercury for a long time" before it was ultimately revealed that Data Intensity did not have the certifications to do so. Doc. 49-3 at 6. And when Josh was presented with an opportunity to bid on a resale deal with SAIC in 2021, he accepted it, directing his sales representative to "put the 20 hours in to get an executable in front of [SAIC]." Doc. 39-10 at 2; Doc. 39-5 at 27. Because the undisputed evidence makes clear that Data

---

deal that originated in the United Kingdom—where resale remains a dominant focus—yet credited to the United States for technical reasons. Doc. 49-3 at 11. But, even accepting Josh's contention as true, it does not undermine the fact that Data Intensity continued to receive at least some revenue from other resale deals in the United States.

[14] The Speros point to the undisputed fact that Data Intensity removed its resale quota and allowed some resale certifications to lapse as circumstantial evidence that it exited the resale market. This evidence indicates, at most, that Data Intensity was less focused on resale, and does not raise a genuine dispute as to whether Data Intensity exited resale altogether. This is particularly so in light of the undisputed fact that Data Intensity (1) continued to incentivize its sales representatives to engage in resale by paying commissions on resale transactions and (2) eventually renewed the lapsed resale certifications. Doc. 49-3 at 7, 10.

Intensity remained at least somewhat active in the resale market, there can be no genuine dispute that Freedom Tech competed with Data Intensity by engaging in resale.[15]

Because Freedom Tech competed with Data Intensity, Josh breached the non-compete clause by planning, launching, and maintaining an ownership interest in Freedom Tech while employed by Data Intensity. Josh admits that he took steps to help Freedom Tech "get[] off the ground" by, for example, establishing Freedom Tech as an Oracle-approved reseller, creating a company email account and logo, and submitting an application to onboard the company with TechData. Doc. 39-5 at 10; Doc. 48-2 at 5. Although Josh may be correct that such preliminary arrangements do not rise to the level of active competition, they certainly constitute preparations to compete, which are also prohibited by the non-compete clause. See Brown & Brown v. Ali, 592 F. Supp. 2d 1009, 1048 (N.D. Ill. 2009) (finding that an employee breached a non-compete clause that prohibited planning to compete by creating a logo and establishing an email address for a competitive enterprise).

---

[15]    Josh asserts that, even if Freedom Tech was in competition with Data Intensity, there remains a genuine dispute as to whether he "understood that to be the case[.]" Doc. 48-1 at 14. But whether or not Josh believed that he was violating the non-compete clause is entirely irrelevant to the question of breach. See Flanders & Medeiros, Inc. v. Bogosian, 65 F.3d 198, 204 n.9 (1st Cir. 1995) ("good faith is not a defense to a breach-of-contract claim.").

Josh also breached the portion of the non-compete clause that prohibits indirect competition by assisting Freedom Tech in competing with Data Intensity. See Centorr-Vacuum Industries, Inc. v. Lavoie, 135 N.H. 651, 654 (1992) (noting that, where a contract prohibits indirect competition, courts should look to "whether the defendant's actions 'indirectly' assisted [a competitive enterprise] in competing with [the plaintiff]").  Although Nate managed the majority of Freedom Tech's business, Josh nonetheless assisted Freedom Tech in securing clients. For example, after Freedom Tech became active in the resale market, Josh met with his contacts at Oracle in hopes of obtaining client references and referred at least one customer (Mercury) to Freedom Tech. Doc. 39-14 at 2; Doc. 39-5 at 10. Finally, Josh breached the portion of the non-compete clause that prohibits being an "owner" of a competitive enterprise by maintaining a 50% ownership interest in Freedom Tech.

These undisputed actions, in isolation and in combination, breach the non-compete clause. Accordingly, Data Intensity is entitled to summary judgment.

> **b.    Nate's Liability**

Data Intensity asserts that it is entitled to summary judgment on its claim that Nate breached the non-solicitation and non-compete clauses in his employment agreement. I agree that the undisputed evidence establishes

that Nate breached his employment agreement and that Data Intensity is entitled to summary judgment on all but one of its theories of liability.

i.      Non-Solicitation Clause

Data Intensity asserts that Nate breached the non-solicitation clause by (1) reselling to Mercury, one of his customers at Data Intensity, and (2) meeting with Oracle and TechData so that they might refer customers to Freedom Tech.

Data Intensity is entitled to summary judgment on the theory that Nate breached the non-solicitation clause by servicing Mercury. Nate admits that Mercury was one of his customers when he worked at Data Intensity and that, within a year of leaving Data Intensity, he facilitated two Mercury resale transactions on behalf of Freedom Tech. Doc. 39-4 at 3, 21-22.

Nate seeks to avoid summary judgment by asserting that there is insufficient evidence that he "traded in" on Data Intensity's goodwill to obtain the Mercury deals. Such evidence, however, is not required to establish that Nate breached the non-solicitation clause. Although the presence or absence of customer goodwill informs the enforceability analysis, once a covenant is determined to be enforceable, the court's only remaining task is to apply its terms as written.

Here, the plain language of the covenant prohibits any solicitation or servicing of certain customers. While the purpose of the covenant is to guard

against the misappropriation of customer goodwill, it can be violated even in the absence of misappropriated goodwill. Thus, Nate breached the non-solicitation clause by servicing a customer covered by the clause, regardless of how he obtained that customer. See 3 Callmann on Unfair Competition, Trademarks & Monopolies § 16:31 (4th ed. 2023) (noting that, although "the term 'solicit' requires the defendant to initiate contact," contracts that prohibit "serv[ing]" customers "bar more than mere solicitation"); see also Arthur J. Gallagher & Co. v. Babcock, 703 F.3d 284, 289-290 (5th Cir. 2012) (concluding that a contract that prohibited "serv[ing]" or "sell[ing] to" certain customers could be violated even in the absence of active solicitation).

Data Intensity, however, has not offered sufficient proof that Nate violated the non-solicitation clause by meeting with Oracle and TechData. Because Oracle and TechData are suppliers, rather than customers, the non-solicitation clause would not prohibit Nate from doing business with them. Nonetheless, Data Intensity asserts that Nate's attempt to obtain customer referrals from Oracle and TechData should be considered a breach of the non-solicitation clause because it amounted to an attempt by Nate to induce a third party to do that which he cannot do himself—namely, solicit Data Intensity's customers.

The problem with this argument is that the record contains no evidence that Nate specifically asked Oracle and TechData to refer Data Intensity

51

customers to him. Rather, it appears as though Nate was interested in referrals for any resale customer. To apply the non-solicitation clause to prohibit Nate from taking steps to obtain customers generally would be to impermissibly broaden scope of the clause beyond its plain terms. Thus, Data Intensity is not entitled to summary judgment on this particular theory.

<blockquote>ii.    Non-Compete Clause</blockquote>

Data Intensity contends that Nate breached the non-compete clause by (1) establishing and operating Freedom Tech while employed by Data Intensity and (2) continuing to operate Freedom Tech following his resignation in May 2020 through November 2021, when Freedom Tech ceased operations.[16]

Much like Josh, Nate primarily asserts that a genuine dispute exists as to whether Freedom Tech was in competition with Data Intensity. For the reasons previously provided, this argument is unavailing.

---

[16]    Although the non-compete clause contained a one-year term, Data Intensity contends that its term was tolled because the contract provided that the restrictive covenants' durational terms "will not run, during any period of time in which [the employee is] in breach[.]" Doc. 37-3 at 4. In Data Intensity's view, Nate was consistently in breach of the non-compete clause throughout the entirety of Freedom Tech's existence, and therefore the one-year term did not begin to run until Freedom Tech's closure in November 2021. Nate contends that he was not in breach, but does not dispute that the non-compete clause's term would toll if he were found to be in breach.

Because Freedom Tech was in competition with Data Intensity, Nate breached the non-compete clause by launching and operating Freedom Tech while employed by Data Intensity. Specifically, Nate either competed with or prepared to compete with Data Intensity during his term of employment by (1) filing a certificate of formation on behalf of Freedom Tech, Doc. 24-3 at 2-3; (2) meeting with his contacts at Oracle and NET(net) in the hopes of drumming up business for Freedom Tech, Doc. 39-4 at 6, 13; (3) maintaining a 50% interest in Freedom Tech, Doc. 39-4 at 8; and (4) closing two resale deals on behalf of Freedom Tech, Doc. 39-4 at 11.

Nate also breached the non-compete agreement by continuing to execute resale deals on behalf of Freedom Tech following his resignation from Data Intensity. Nate admits that he engaged in resale at both Data Intensity and Freedom Tech, and he does not dispute that Freedom Tech serviced customers within his assigned sales territory at Data Intensity. Doc. 26 at 6; Doc. 39-4 at 30; Doc. 39-16 at 2. Indeed, the evidence indicates the vast majority of Freedom Tech's deals were with companies located in either the southeast corridor or the east coast of the United States. Doc. 39-16 at 2. Accordingly, Nate provided resale services similar to those that he provided at Data Intensity for a competitive enterprise within his assigned territory in breach of his non-compete clause.

For these reasons, Data Intensity is entitled to summary judgment on its claim that Nate is liable for breach of the non-compete clause.

## B.   Breach of Fiduciary Duty Claim

"To establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed [it] a fiduciary duty and that the defendant breached" that duty. Baker v. Montrone, 2010 DNH 006, 2020 WL 128531, at *8 (D.N.H. Jan. 10, 2020) (quoting Estate of Eller v. Bartron, 31 A.3d 895, 897 (Del. 2011)). One of the duties imposed upon fiduciaries is the duty of loyalty. White v. Ransmeier & Spellman, 950 F. Supp. 39, 43 (D.N.H. 1996). A fiduciary violates his duty of loyalty "when he acts in a way that is contrary to, or harmful of, the corporate interest[.]" Hansen v. Sentry Ins. Co., 756 F.3d 53, 63 (1st Cir. 2014).

Data Intensity asserts that Josh breached his fiduciary duty of loyalty by owning a competitive enterprise and assisting Freedom Tech in obtaining resale deals during his term of employment. Josh asserts, in the first instance, that a genuine factual dispute exists as to whether he owed fiduciary duties to Data Intensity. Josh further contends that, in any event, Data Intensity cannot establish that he breached his duty of loyalty because whether his actions went beyond permissible preparations to compete and whether he meaningfully assisted Freedom Tech in obtaining clients are disputed questions of fact.

I begin by considering whether Josh owed Data Intensity fiduciary duties before proceeding to the question of breach.

1.    Fiduciary Relationship

Under New Hampshire law, a fiduciary relationship will be found to exist whenever "one has gained the confidence of the other and purports to act or advise with the other's interest in mind." Clark & Lavey Benefits, Inc. v. Educ. Dev. Ctr., Inc., 157 N.H. 220, 227 (2008); see Lash v. Cheshire Cnty. Sav. Bank, 124 N.H. 435, 439 (1984).  Applying this standard, this court has consistently recognized that an employee who holds "a position of trust and confidence, such as a supervisor, manager, director, or officer, owes a fiduciary duty of loyalty to her employer." White, 950 F. Supp. at 43 (quoting Liberty Mut. Ins. v. Ward, No. C-93-610-L, 1994 WL 369540, at *4 (D.N.H. July 11, 1994)).

While it is true that the question of whether a fiduciary relationship exists must be reserved for the trier of fact "[i]n doubtful cases," this is not a doubtful case. Lash, 124 N.H. at 438; see also Schneider v. Plymouth State Coll., 144 N.H. 458, 462 (1999) (noting that the question of whether a college owed a fiduciary duty of care to its students was "a question of law"). It is undisputed that, as Vice President, Josh was responsible for managing and supervising the entire North American sales team. Doc. 39-5 at 8, 15. While Josh may not have had the authority to "set company strategy" or make "high

level strategic decisions," he nonetheless was responsible for implementing the company's strategy within his sales team. Doc. 48-2 at 3. Cf. Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc., 748 N.W.2d 626, 644 (Neb. 2008) (concluding that the defendant was not a fiduciary where he "had no involvement in the management and operation of the corporation beyond his own production"). To this end, Josh was entrusted with information regarding Data Intensity's business strategies and methodologies, as well as its customer base. Doc. 39-5 at 4; Doc. 39-2 at 2-3; Doc. 39-1 at 8. See Hansen, 756 F.3d at 55 (finding that a fiduciary relationship existed where the defendant "had access to confidential information . . . along with knowledge of [his employer's] current and potential customers, and its marketing strategies"). Josh's management authority, combined with his access to confidential information, makes clear that he owed a fiduciary duty of loyalty to Data Intensity.

In arguing to the contrary, Josh notes that he did not report directly to the CEO and that there were several C-suite executives above him in the company's hierarchy. These arguments, however, are unavailing. Even if it is true that, as Josh contends, he reported to the Chief Revenue Officer rather than the CEO, the fact remains that he was not "merely a low-level employee or worker bee," but rather a high-ranking manager who reported directly to one of the company's most senior executives. PC Connection, Inc. v. Price,

2015 DNH 202, 2015 WL 6554546, at *8 (D.N.H. Oct. 29, 2015) (cleaned up);

see also TalentBurst, Inc. v. Collabera, Inc., 567 F. Supp. 2d 261, 266 (D.

Mass. 2008) (noting that, although the "duty of loyalty does not extend to

'rank-and-file' employees under Massachusetts law," it nonetheless applied to

employees "who occupied a higher rung on the corporate ladder, such as a

manager or executive"). And, of course, it is not the case that only those at

the very highest echelon of an organization owe fiduciary duties. See, e.g.,

Broadus v. Infor, Inc., 2019 DNH 077, 2019 WL 1992953, at *3 (D.N.H. May

6, 2019) (concluding that the plaintiff adequately alleged that the defendant

was a fiduciary even though he was "an at-will, nonmanagerial employee");

cf. Clark & Lavey Benefits, Inc., 157 N.H. at 227 (noting that the "'fiduciary

relationship' has been defined comprehensively" under New Hampshire law).

Accordingly, there can be no genuine dispute that, as Vice President, Josh

owed fiduciary duties to Data Intensity.

      2.      Breach of the Duty of Loyalty

      The fiduciary duty of loyalty "demands that the employee act solely for

the benefit of the employer, never to the employer's detriment." White, 950 F.

Supp. at 43 (quoting Ward, 1994 WL 369540, at *4). Pursuant to this

standard, a fiduciary is permitted to prepare to compete against his employer

so long as he does not cross over into active competition. Orkin

Exterminating Co., Inc. v. Rathje, 72 F.3d 206, 207 (1st Cir. 1995); accord

Restatement (Third) of Agency § 8.04 (2006). Permissible preparatory actions include, for example "opening a bank account and obtaining office space and telephone service" for a competitive enterprise or "purchasing a rival business[.]" Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., 791 F. Supp. 2d 33, 49 (D.D.C. 2011) (cleaned up). Active competition, in contrast, includes "solicitation of business for an employee's personal endeavor" or otherwise "competing with the employer for customers or employees[.]" Id.

Josh's undisputed actions clearly went beyond mere preparations to compete and rose to the level of active competition.[17] Josh did not merely prepare to launch Freedom Tech while he was at Data Intensity, but rather introduced the company into the market as an active competitor. Indeed, eight out of the nine resale deals that Freedom Tech secured over its lifetime occurred while Josh was still employed by Data Intensity. Doc. 39-16 at 2. By "commenc[ing] doing business as a competitor" while employed by Data Intensity, Josh breached his fiduciary duties. Restatement (Third) of Agency § 8.04, cmt. c (2006); see also Rash v. JV Intermediate, Ltd., 498 F.3d 1201, 1210 (10th Cir. 2007) ("an employee's independent enterprise cannot compete or contract with the employer without the employer's full knowledge."); E.J. McKernan Co. v. Gregory, 623 N.E.2d 981, 993 (Ill. App. Ct. 1993) (noting

---

[17]    For the reasons I explained, I reject Josh's argument that Freedom Tech was not in competition with Data Intensity.

that employees may "form a rival corporation and outfit it for business," but may not "commence[] business as a rival concern while still employed").

Josh argues that "the basic existence of Freedom Tech" cannot constitute a breach of his fiduciary duties where, as here, he left the operation of the business to Nate and did not do "anything to actually 'help' Freedom Tech" compete against Data Intensity. Doc. 48-1 at 19. I disagree.

As the Restatement (Third) of Agency recognizes, a fiduciary breaches his duty of loyalty by owning a business that actively competes with his employer, even if he delegates the day-to-day operation of that business to another. Restatement (Third) of Agency § 804, cmt. b, illus. 2 (2006); see also id. at Reporter's Notes, cmt. b ("it would seem that the ownership of a significant interest in a business which is competitive with one's employer while one is still employed would not be preparation to compete after employment but competition during employment, conduct impermissible on any analysis.") (cleaned up). This conclusion comports with the general rule that fiduciaries may not act to the detriment of their employer. Introducing a new, active competitor into the market undoubtedly works to the detriment of one's employer, even if the fiduciary remains uninvolved in the competitor's day-to-day operations.

In any event, the undisputed evidence indicates that Josh did, in fact, assist Freedom Tech in obtaining clients. As I have explained, Josh admits

that he reached out to his contacts at Oracle in hopes of obtaining client references for the then-operational Freedom Tech and referred Mercury to Freedom Tech. See White, 950 F. Supp. at 43 (recognizing that "soliciting clients of the company for the employee's competing business" is generally considered a breach of fiduciary duties). Therefore, the undisputed evidence indicates that Josh competed with Data Intensity while he was employed by the company in violation of his fiduciary duties.

## IV.   CONCLUSION

For the foregoing reasons, the Speros' motion for summary judgment (Doc. 37) is denied and Data Intensity's motion for partial summary judgment (Doc. 38) is granted.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

March 25, 2024

cc:    Counsel of record